**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ANITA BYRD**, |
| Plaintiff, |
| |
| v. |
| |
| **TOM VILSACK**, **Secretary**, |
| **United States Department of Agriculture**, |
| |
| Defendant. |

Civil Action No. 10-cv-1809 (RLW)

**MEMORANDUM OPINION**

Plaintiff Anita Byrd ("Byrd") works as an Information Technology Specialist in the United States Department of Agriculture's Natural Resources Conservation Service ("NRCS"). She brings this action against Tom Vilsack, in his official capacity as Secretary of Agriculture, alleging that she was discriminated against on account of her race (African American) and retaliated against, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* This matter is presently before the Court on the Department's Motion for Summary Judgment.  (Dkt. No. 29).[1]  Upon careful consideration of the parties' briefing and the entire record in this case, the Court concludes that the Department's Motion will be **GRANTED IN PART** and **DENIED IN PART** for the reasons set forth herein.

**BACKGROUND**

For the most part, the facts underlying Byrd's claims are undisputed.  Where disputes exist, the Court sets forth the parties' respective positions, but generally credits Byrd's evidence and draws all reasonable inferences in her favor.

---

[1]     As Secretary Vilsack is named in his official capacity, the Court will refer to the defendant throughout this opinion as the "Department" or "USDA" for simplicity's sake.

Byrd has worked as an Information Technology Specialist in the Information Technology ("IT") Division of NRCS since 1999. (Dkt. No. 37 ("Joint Facts") at ¶ 1).[2] On July 16, 2007, NRCS posted a vacancy announcement for the position of Branch Chief of the IT Division's Policy and Planning Branch, based out of Beltsville, Maryland. (*Id.* ¶ 2). Jack Carlson, NRCS Chief Information Officer, was the recommending official for the position, and his immediate supervisor, Katherine Gugulis, NRCS Deputy Chief for Management, was the selecting official. (*Id.* ¶ 4). After receiving and reviewing applications, the NRCS Human Resources staff identified six applicants, including Byrd, as among the best qualified, and referred them to Mr. Carlson for consideration. (*Id.* ¶ 5). At the time Byrd applied for the Branch Chief position, she had filed a formal EEO complaint that had been pending for more than a year. (*Id.*).[3]

To fill the position, Mr. Carlson convened a four-member panel to interview each of the applicants, comprised of himself and three other management-level IT professionals within USDA. (*Id.* ¶ 6).[4] He also arranged for at least one representative from the NRCS Civil Rights Division to observe each of the interviews to ensure they were fairly conducted. (*Id.* ¶ 7). Prior to the interviews, Mr. Carlson provided the panelists with a copy of the Branch Chief job description and the applications submitted by the six candidates, but he did not share his initial

---

[2]   When referencing evidentiary material, the Court endeavors to cite to the applicable paragraph numbers of the parties' Joint Statement of Material Facts, (Dkt. No. 37), but the Court sometimes cites directly to evidence in the record, where appropriate.

[3]   According to Byrd's Complaint, she filed her original EEOC charge on July 3, 2006. (Dkt. No. 1 ("Compl.") at ¶ 2). Neither party submitted copies of this charge (nor any other EEOC charge) in connection with this motion, but since the timing of Byrd's initial charge is uncontested, the Court presumes the accuracy of this assertion for purposes of this decision.

[4]   Along with Mr. Carlson (Caucasian), the interview panelists included: Kelvin Fairfax (African American), Director of the Security Compliance Division in USDA's Office of the Chief Information Officer; Stacy Riggs (Caucasian), Supervisory Program Specialist in the Office of the Chief Information Officer; and Jim Heald (Caucasian), Director of the Geospatial Information Systems Division of USDA's Farm Service Agency. (Joint Facts at ¶ 6).

impressions of the applications with anyone else, nor did he mention Byrd's EEO activity to any of the other panelists. (*Id.* ¶ 8). Five of the applicants, including Byrd, were interviewed on September 14, 2007, and the sixth applicant was interviewed on September 24, 2007. (*Id.* ¶ 10). At the conclusion of each interview, all of the panelists except Mr. Carlson independently scored the candidates' responses to each question on a five-point scale, with a "5" being the highest possible score. (*Id.* ¶ 8). Following the interviews, the panelists provided their score sheets to Mr. Carlson to be tallied. (*Id.* ¶ 11). According to Mr. Carlson's summary score sheet, Michelle Wockenfuss—a then-Supervisory IT Specialist with the Food and Drug Administration— received the highest overall score with 142 points (out of 180), while Byrd received the lowest overall score with 113.5 points. (*Id.* ¶ 12). Notably, Byrd disputes the validity of these scores, complaining that the Department never produced the individual panelists' score sheets, only Mr. Carlson's summary score sheets, which Byrd implies (but never expressly argues) may have been doctored by Mr. Carlson.

At this point, the parties' versions of events diverge. According to the Department, Mr. Carlson briefed Ms. Gugulis following the interviews, and he informed her that two individuals—Ms. Wockenfuss and another candidate—were the panel's top-rated applicants by a significant margin. (Dkt. No. 49-2, Ex. 2, Carlson Decl. at ¶ 11, Gugulis Decl. at ¶¶ 4-5). In turn, Mr. Carlson recommended Ms. Wockenfuss for the position, and USDA asserts that Ms. Gugulis concurred with his recommendation and selected Ms. Wockenfuss as the Branch Chief. (Carlson Decl. at ¶ 11, Gugulis Decl. at ¶ 6). Thereafter, it is undisputed that the NRCS Human Resources Division contacted Ms. Wockenfuss on October 1, 2007, to offer her the position, which she accepted. (Joint Facts at ¶ 17). It is also undisputed that Mr. Carlson notified the IT Division staff of Ms. Wockenfuss's promotion on October 4, 2007. (*Id.*). With respect to the

days leading up to Ms. Wockenfuss's announcement, however, Byrd paints a very different picture.  She asserts that before announcing the selection of Ms. Wockenfuss, Mr. Carlson had personally informed Byrd on September 24, 2007, that he and Ms. Gugulis had determined that Byrd would be promoted to the position.  (Dkt. No. 32-1 ("Byrd Dep.") at 131, 133-34).  But thereafter, in the wake of Byrd's complaint about a coworker's alleged racial comment on or around September 28, 2007, Byrd contends that Mr. Carlson reversed his decision as a means of retaliation, and recommended and/or selected Ms. Wockenfuss instead.  (*Id.*).

With respect to this alleged racial comment, Mr. Carlson held a meeting of the Beltsville-based IT Department staff on September 26, 2007, and several individuals, including Mr. Carlson and Byrd, participated by telephone.  (Joint Facts at ¶ 19).  After Byrd dialed into the conference line, she heard Elizabeth Pigg (Caucasian) and another coworker come onto the line and begin speaking to each other; Ms. Pigg was unaware that Byrd was on the line.  (*Id.* ¶ 20).  According to Byrd, Ms. Pigg brought up the Branch Chief vacancy and asked whether anyone knew who the new "HNIC" would be.  (Byrd Dep. at 96).  "HNIC" is an abbreviation for "head nigger in charge."  (*Id.*).  Later in the meeting, Byrd confronted Ms. Pigg and said that she heard her use the term "HNIC" at the beginning of the call.  (Joint Facts at ¶ 21).  Ms. Pigg became upset and denied using the term, insisting that Byrd must have misheard her, and that she used the term "HMFIC," which apparently stands for "head motherfucker in charge."  (*Id.*).  Ms. Pigg ultimately walked out of the meeting and slammed the door behind her, (*id.*), at which time Byrd alleges that Ms. Pigg shouted at Byrd, "you frequent filer, you."  (Byrd Dep. at 123).  The meeting adjourned shortly thereafter.  (Joint Facts at ¶ 22).  Later that day, Mr. Carlson notified Byrd that the incident would be investigated and that appropriate action would be taken if Ms. Pigg were found to have used a racially offensive term.  (*Id.* ¶ 23).

Two days later, on September 28, 2007, Byrd emailed Mr. Carlson and indicated that she was feeling considerable stress and anxiety as a result of her exchange with Ms. Pigg. (*Id.* ¶ 25). Mr. Carlson told Byrd that she could work from home that day, and that she could work from NRCS headquarters the following week until the investigation was completed. (*Id.*). The same day, Mr. Carlson contacted an EEO Specialist, Renzlo Page, and asked Mr. Page to take over the investigation into Byrd's allegations. (*Id.* ¶ 26). Mr. Page interviewed the participants at the meeting, including Byrd and Ms. Pigg, but none of the other participants—including both African-American and Caucasian employees—corroborated Byrd's contention that Ms. Pigg used the term "HNIC." (*Id.*). On the other hand, two participants did corroborate Ms. Pigg's version of events, stating that they heard her use the term "HMFIC." (*Id.*). Ultimately, based on the results of the investigation, Mr. Carlson issued a written reprimand to Ms. Pigg for using vulgar language in the workplace and for leaving the staff meeting in an unprofessional manner. (*Id.* ¶ 29). Mr. Carlson also issued a letter of counseling to Byrd, explaining that, although her distress in mishearing Ms. Pigg's remarks was understandable, Byrd had mishandled the situation by confronting Ms. Pigg in a group setting, rather than privately raising the issue with a supervisor. (*Id.* ¶ 30). Byrd's counseling letter carried no disciplinary consequences. (*Id.*).

About one month later, on October 30, 2007, Byrd contacted Mr. Carlson to lodge a complaint of sexual harassment against a male coworker, Mr. Lytle, who she accused of engaging in inappropriate behavior toward her. (*Id.* ¶ 32).[5] The following day, Byrd emailed Mr. Carlson late in the afternoon, requesting to "immediately work from home," "due to the

---

[5] While Byrd originally asserted that Mr. Lytle's alleged conduct toward her caused and/or contributed to a hostile work environment, she essentially abandons those claims in opposing summary judgment. As such, the Court need not go into great detail surrounding her allegations regarding Mr. Lytle; for purposes of this motion, his alleged conduct is only relevant to the extent it supposedly prompted Byrd's October 31, 2007, request to telework.

current work environment." (*Id.* ¶ 38). After consulting with Employee Relations, Mr. Carlson determined that Byrd's request did not satisfy NRCS's telework policy, and he notified Byrd that she should report to the office the next day, as regularly scheduled. (*Id.* ¶ 39). Under NRCS policy, telework requests "may be granted" only in two situations: (1) "as a reasonable accommodation when necessitated due to a medical condition," and "[r]equests of this nature for telework will be referred to the NRCS [Disability Emphasis Program Manager] for determination of reasonable accommodation"; and (2) "for emergency situations," which "is expected to be an occasional occurrence." (*Id.* ¶¶ 40-41). Byrd disputes Mr. Carlson's determination and maintains that her request should have been granted as an "emergency situation," given her recent harassment complaint against Mr. Lytle.

In any event, Byrd did not physically report to work the following morning. At about 8:30 a.m., Ms. Wockenfuss emailed Byrd, reminding that her telework request was not granted and that she needed to report to the office or be charged as "absent without leave" ("AWOL"). (*Id.*). Byrd did not report to the office until 2:15 p.m. (as opposed to her normal start time of 7:30 a.m.), and, as a result, Ms. Wockenfuss charged Byrd with 7.75 hours of AWOL, after consulting with Employee Relations. (*Id.*). For her part, Byrd maintains that she did not learn her telework request had been denied until she checked her email account on the afternoon of November 1st, and she immediately reported to the office. (Byrd Dep. at 181-182).[6]

Around this time, Byrd began having communication issues with her newly-appointed supervisor, Ms. Wockenfuss. First, on November 8, 2007, Byrd wrote to Ms. Gugulis requesting

---

[6]     Byrd also submitted two other telework requests that the Department denied—on December 18, 2007, and January 9, 2008, respectively—both of which were described as adverse actions in her Complaint. (*See* Compl. at ¶ 20). However, Byrd fails to address either of these other instances in her opposition, and because these claims are deemed conceded (as discussed below), the Court foregoes a detailed discussion of Byrd's related allegations.

"immediate reassignment" to another position, due to what she believed was "hostile and confrontation [sic] behavior" by managers and coworkers; Byrd also copied the NRCS Chief and Associate Chief on her message. (Joint Facts at ¶ 48). On that same day, Ms. Wockenfuss met with Byrd to discuss her concerns, but Byrd was apparently "argumentative [and] generally refused to tell [Wockenfuss] about her work," simply telling Ms. Wockenfuss to "ask Jack [Carlson] again and again." (*Id.*). Thereafter, Ms. Gugulis denied Byrd's reassignment request in light of Byrd's pending request for telework as a reasonable accommodation (which was subsequently denied) and a pending EEO complaint, and explaining that it was "reasonable to allow the applicable administrative systems . . . to process your concerns as you have requested." (*Id.* ¶ 49). Ms. Gugulis also instructed Byrd to "adhere to the prescribed chain of command and communicate [her] concerns to [her] first-level supervisor" or to "follow the administrative procedures established by NRCS (e.g., EEO complaint process, administrative grievance, etc.)." (Dkt. No. 29-3, Ex. 24).

Several weeks later, Ms. Wockenfuss emailed Byrd regarding the status of an assignment on November 21, 2007. (Joint Facts at ¶ 50). Byrd responded by accusing Ms. Wockenfuss of "obvious micro-management" and "stealthy psychotic tactics," and Byrd copied senior NCRS management on her message, as well as staff in Secretary Vilsack's office. (*Id.*). Ms. Wockenfuss informed Byrd that she expected Byrd to "provide [her] with any requested information in a professional and respectful manner," and she reiterated Ms. Gugulis's instruction to limit workplace concerns to Ms. Wockenfuss, not senior management. (*Id.* ¶ 51). Subsequently, on January 25, 2008, Ms. Wockenfuss issued a supervisory notice to Byrd for failing to meet several deadlines. (*Id.* ¶ 53). In response, Byrd sent a letter to Ms. Wockenfuss accusing her of "abuse of authority" and questioning her "reliability and sustainability to

7

supervise since you exhibit such blatant disregard for agency rules and regulations." (*Id.* ¶ 54). Byrd copied Ms. Gugulis and a former NRCS Chief Information Officer on this message. (*Id.*). Based on Byrd's disregard for the directive to cease including senior management on her communications, Ms. Wockenfuss consulted with an Employee Relations Specialist and issued Byrd a reprimand, which advised Byrd that future misconduct "may lead to more severe disciplinary action." (*Id.* ¶ 55).

On March 1, 2008, Byrd again wrote to Ms. Gugulis requesting reassignment from Ms. Wockenfuss's supervision, and Byrd again copied the NRCS Chief and Associate Chief on her message. (*Id.* ¶ 56). In the following weeks, Byrd continued to copy senior NRCS managers and other IT Division coworkers on several additional email messages sent to Ms. Wockenfuss. (*Id.* ¶ 57). In late March 2008, Ms. Wockenfuss considered suspending Byrd for her conduct, but Mr. Carlson decided to delay that response for "3-4 weeks to see if the situation improves." (*Id.*). Between April 3 and 10, 2008, however, Byrd sent several additional emails to Ms. Wockenfuss on which she copied NCRS management and IT Division coworkers. (*Id.* ¶ 59). Among other remarks in these messages, Byrd accused Ms. Wockenfuss of playing "psychological games." (Dkt. No. 29-4, Ex. 34). Ultimately, on April 28, 2008, Ms. Wockenfuss issued Byrd a notice of proposed suspension without pay, based on Byrd's "[f]ailure to [f]ollow [i]nstructions." (*Id.* ¶ 60). Byrd subsequently submitted an oral and written challenge to Wendell Oaks, then-Acting Chief Information Officer, who would decide whether to uphold the suspension, but Mr. Oaks ultimately concurred and upheld the 14-day suspension decision. (*Id.* ¶¶ 61-62).

Shortly before Byrd's proposed suspension, she and Ms. Pigg had an altercation in the office restroom on April 14, 2008. Immediately after the incident, both women approached Ms.

Wockenfuss "angry" and "accusing the other," at which time Ms. Wockenfuss separated the two and spoke first with Byrd about what happened.   (*Id.* ¶¶ 65-66).  According to Byrd, after she had gone into the bathroom, Ms. Pigg "pushed her down and fell on top of her." (*Id.*).  Ms. Pigg, on the other hand, claimed that Byrd came into the bathroom "trying to make amends," but then pulled Ms. Pigg down to the ground.  (*Id.*).  There were no other witnesses to the incident.  (*Id.*). Both women were sent home for the day, and, after consulting with Mr. Carlson and Employee Relations, the decision was made to place both Byrd and Ms. Pigg on administrative leave while the incident was investigated.  (*Id.*).  Following that leave period, Ms. Pigg did not return to work and apparently chose to proceed with her previously announced retirement plans.  (*Id.* ¶ 70). Byrd returned to work, but no further disciplinary action was taken against her.  (*Id.*).

Based on these allegations, Byrd filed her Complaint against the Department on October 26, 2010, asserting claims of racial discrimination and retaliation under Title VII.  (*See* Compl.).

## ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of

evidence" in support of its position, *Anderson*, 477 U.S. at 252.  But "[i]f material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

### B.  Byrd's Race Discrimination Claims

The Court begins with Byrd's claims for race discrimination.  Through her Complaint, Byrd identified a number of allegedly adverse actions that she claims were racially discriminatory, including: (1) her non-selection for the Branch Chief position in late 2007; (2) the Department's denial of her telework requests; and (3) her 14-day suspension from USDA in May 2008.  (*See generally* Compl.).  In seeking summary judgment, the Department presses for dismissal of all of these race discrimination claims, arguing, *inter alia*, that each of its actions was based on a legitimate, non-discriminatory reason that had nothing to do with Byrd's race.  (Dkt. No. 29 ("Def.'s Mem.") at 4-14, 19-27).   While Byrd's opposition brief technically addresses each of these three claims, Byrd's arguments are focused exclusively on why she contends that each of these actions was <u>retaliatory</u>.  She otherwise fails to argue, much less establish, that any of these acts were <u>racially discriminatory</u> on the part of USDA.

As the Department rightly points out, "when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded," *Hopkins v. Women's Div., Gender Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)), and this is precisely the result the Department urges here.  Given the utter absence of any discussion in Byrd's opposition as to how these actions were allegedly racially discriminatory, the Court agrees that Byrd has conceded these claims.  As a result,

Byrd's race discrimination claims based on her non-selection for the Branch Chief position, the denial of her telework requests, and her May 2008 suspension will be dismissed.

### C. Byrd's Retaliation Claims

Title VII prohibits an employer from discriminating and/or retaliating against an employee "'because [s]he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding." *Steele*, 535 F.3d at 695 (quoting 42 U.S.C. § 2000e-3(a)). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Title VII retaliation claims are evaluated pursuant to a familiar, three-step framework. First, the plaintiff must establish a *prima facie* case by demonstrating: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Next, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the challenged employment action(s). *McDonnell Douglas*, 411 U.S. at 802-04; *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Finally, the plaintiff "must be afforded the opportunity to prove" that the employer's proffered motive "was not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006) (internal quotations omitted).

However, our Circuit has instructed that, once an employer provides a legitimate, non-discriminatory basis for its decision at the summary judgment stage, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). In such cases, the burden-shifting framework falls to the wayside, and the "sole remaining question" for the Court to resolve is "whether, based on all the evidence, a reasonable jury could conclude that

the [Department's] proffered reason for the [decision] was pretext for retaliation." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010). In so determining, the Court must consider: "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Czekalski v. Peters*, 475 F.3d 360, 363-64 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). "This boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded [retaliatory] motives?" *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).

In this case, Byrd contends that three allegedly adverse actions on the part of USDA were motivated by unlawful retaliation against her: (1) her non-selection for the Branch Chief position; (2) the Department's denial of her telework requests; and (3) her 14-day suspension in May 2008. The Court considers these claims in turn.

### 1. Byrd's Non-Selection for the Branch Chief Position

Byrd first argues that her non-selection for the Branch Chief position in September 2007 was retaliatory. In seeking summary judgment on this claim, USDA advances a legitimate, non-retaliatory reason for not choosing Byrd for this position—that the Department simply selected a more qualified candidate, Ms. Wockenfuss. Given this, the Court heeds our Circuit's guidance and proceeds to the central question underlying Byrd's claim, asking whether a reasonable jury,

when viewing all the evidence, could find the Department's explanation to be a mere pretext designed to disguise unlawful retaliation.

Because this is a non-selection claim, one of the ways Byrd can attempt to prove pretext is by establishing that she was "significantly better qualified for the job" than the ultimate selectee. *Aka*, 156 F.3d at 1294; *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) ("[A] disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate.") (internal citation omitted). But she is not limited to this sort of qualifications-based attack. Byrd can also attempt to establish pretext or retaliatory animus by "expos[ing] other flaws in the employer's explanation," for example, by arguing that the explanation was "fabricated after the fact" or "that it contradicts other contemporaneous accounts of the employer's decision." *Aka*, 156 F.3d at 1295.

In this case, Byrd largely eschews the former approach in favor of the latter, attempting to point out flaws and inconsistencies in USDA's explanation for choosing Ms. Wockenfuss for the Branch Chief position, rather than her. Principally, Byrd assails the Department's explanation as false, claiming that <u>she</u> was originally selected as Branch Chief, but that Mr. Carlson and/or Ms. Gugulis "reversed their decision upon learning that [Byrd] was pressing a claim of racial discrimination for being called an 'HNIC.'" (Pl.'s Opp'n at 11). More specifically, Byrd contends that, on September 24, 2007, Mr. Carlson privately informed her that she had been selected for the Branch Chief position, but then, less than one week later—and just a few days after Byrd complained about Ms. Pigg's alleged racial remark—Mr. Carlson announced that Ms. Wockenfuss, and not Byrd, was to become the Branch Chief. (*Id.* at 11-13).

From this evidence, Byrd maintains, a reasonable jury could find that the Department's justification is pretextual and an effort to disguise unlawful retaliation.

The Department urges the Court to reject this line of argument because, in its view, Byrd's testimony "is unsupported by corroborating evidence . . . and is sharply undermined by other credible evidence." (Dkt. No. 36 ("Def.'s Reply")) at 5). The Department insists that, to reach this conclusion, the Court need not "weigh evidence" or "make a credibility determination" as between competing versions of events. (*Id.* at 4). But in proposing that the Court simply disregard Byrd's sworn deposition testimony, this is exactly what the Department asks the Court to do. As Byrd points out, she offered the following testimony under oath:

> Q:     You had mentioned that Mr. Carlson, prior to the incident with Ms. Pigg in September of '07, had offered you a position or informed you [that] you had been selected for a position within the IT division. Do you recall that testimony?
>
> A:     Yes.
>
> Q:     What position are you referring to there?
>
> A:     The Policy and Planning Branch Chief position.
>
> *      *      *
>
> Q:     Now, exactly what did Mr. Carlson say to you that made you understand or think that you had been selected for the position?
>
> A:     We had a discussion about future direction and planning and how he wanted the IT organization to move forward, and he told me this hasn't been released yet, but you will be moving into the leadership role, and I've already spoken with Kathy, and we have ordered your BlackBerry.
>
> *      *      *
>
> Q:     And when he mentioned that you were moving into that leadership role, is that the words he used? I want to make sure I understand the phrase he used with you.
>
> A:     To my best recall, he said, "Anita, I've spoken with Kathy, and we've decided you will be moving into the leadership role." There was only one role I had applied for and/or discussed or competed for, and that was the Policy and Planning Branch Chief, so I understood that to mean that I had been selected, and it had been concurred by Kathy Gugulis, who was the second-line supervisor, who would have concurred with Jack's determination.

(Byrd Dep. at 131, 133-34).  Thus, according to Byrd, Mr. Carlson specifically told her that she was getting the promotion to Branch Chief.  On the other side of the coin, it is also true that Mr. Carlson submitted an affidavit expressly denying that he made any such statements—he specifically avers that "[a]t no time did [he] tell Ms. Byrd that she had been or would be selected for the branch chief position."  (Dkt. No. 29-1, Ex. 2, Carlson Decl. at ¶ 12).  But without weighing the evidence and making a credibility determination as between Mr. Carlson and Byrd, the Court at this stage cannot simply overlook Byrd's testimony in favor of the Department's version of events.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences are jury functions, not those of a judge."); *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006) ("On the record at hand, neither the District Court nor this court can conclude that appellees' story is truthful and appellant's story is a fabrication, at least not if all of the evidence is viewed in the light most favorable to appellant as required by Federal Rule of Civil Procedure 56(c).").  In ruling on a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255.  It is for the jury, and not the Court, to determine who is telling the truth.

To be sure, the Department presents strong, countervailing evidence to support its justification that it selected Ms. Wockenfuss for the Branch Chief position—and, in turn, did not select Byrd—because Ms. Wockenfuss was the most qualified candidate.  There is no dispute that all of the candidates, including Byrd, participated in an interview and were ranked by the same interview panel.  (Joint Facts at ¶ 10).  Byrd concedes as much, but she challenges the veracity of the final interview scores proffered by the Department, which rated Ms. Wockenfuss as the top-ranked candidate (with a score of 142 points), while Byrd finished last (with a score of

113.5 points).   (Dkt. No. 29-1, Ex. 2, Carlson Decl. at Ex. A).   More specifically, Byrd complains that the Department only produced Mr. Carlson's "summary score sheet," but not the individual evaluations personally completed by each of the panelists.  (Pl.'s Opp'n at 12 n.1).   In turn, Byrd impliedly argues (without ever expressly making the accusation) that Mr. Carlson somehow doctored his score sheets to place Byrd at the back of the line.  While it is true that the Department did not produce the panelist's individual score sheets, Byrd's argument is seriously undercut by the fact that the Department did provide the Court with affidavits from the three panelists, wherein they confirmed their uniform impressions that they did not consider Byrd to be the best candidate for the position.  Given all this, on balance, Byrd's evidence on this claim appears paper-thin, and "[a] jury may resolve . . . these issues in favor of [the defendant], but without improperly resolving disputed issues of fact, [this Court] cannot."  *Arrington*, 473 F.3d at 337  (quoting *Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999)).   Assuming the truth of Byrd's testimony, as the Court must, a reasonable jury could find the fact that Mr. Carlson initially offered Byrd the promotion, but then reneged on that offer just a couple of days after Byrd complained about Ms. Pigg's racial comment, to be evidence indicative of pretext or some retaliatory motive on the Department's part.  Therefore, on the present record, the Court must deny summary judgment on this claim.

### 2.   The Denial of Byrd's Telework Requests

Byrd asserts that the Department's refusal to allow her to telework on certain occasions constituted unlawful retaliation for her EEO complaints.   Byrd's Complaint identifies three separate occasions on which she claims she was wrongfully denied the ability to telework: October 31, 2007, December 18, 2007, and January 9, 2008.  (Compl. at ¶¶ 17-20).   In moving for summary judgment, the Department insists that none of these requests gives rise to a viable

retaliation claim.  (Def.'s Mem. at 19-23).  But in opposition, Byrd focuses exclusively on her first request in October 2007, and she otherwise fails to respond altogether to USDA's arguments surrounding her other two requests.  (Pl.'s Opp'n at 16-17).  The Court will therefore deem those claims conceded, *Hopkins*, 284 F. Supp. 2d at 25 (citing *Bender*, 127 F.3d at 67-68), and will confine its analysis of this claim strictly to Byrd's single telework request in October 2007, just as Byrd has done.

The Department first seeks dismissal of Byrd's telework claim by arguing that the denial of an employee's telework request does not amount to an actionable adverse employment action. To qualify as an adverse action, our Circuit has explained that "[a]n employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009); *see also Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (defining "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.").  In the context of retaliation claims, however, the definition of adverse action is arguably somewhat broader, such that "actions giving rise to claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,' but reach any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Baird v. Gotbaum*, 662 F.3d 1246, 1248-49 (D.C. Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)).  Despite this seemingly more relaxed standard, however, the Court of Appeals has been careful to forewarn that

"[a]ctionable retaliation claims are [still] limited to those where an employer causes 'material adversity,' not 'trivial harms.'" *Wiley*, 511 F.3d at 161 (quoting *Burlington N.*, 548 U.S. at 68).

With these standards in mind, the Department correctly points out that a number of courts have held that the denial of a request to work from home is not, in and of itself, an actionable adverse action. *See, e.g.*, *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010) ("Being denied the ability to work from home on, at most, three occasions is a minor annoyance, not an adverse action."); *Bright v. Copps*, 828 F. Supp. 2d 130, 148-49 (D.D.C. 2011) ("[W]hile it is true that an actionable injury in the context of a retaliation claim under Title VII is different and perhaps less onerous than a discrimination claim, it is still the case that requiring an employee to attend a face-to-face meeting does not rise to the level of severity that could well dissuade a reasonable worker from making or supporting a charge of discrimination."); *Homburg v. UPS*, No. 05-2144-KHV, 2006 WL 2092457, at *9 (D. Kan. July 27, 2006) ("[D]istrict courts . . . have consistently held that the denial of a request to work from home is not adverse employment action.") (collecting cases); *Daniels v. Fed. Reserve Bank of Chi.*, No. 98-C-1186, 2006 WL 861969, at *12 (N.D. Ill. Mar. 31, 2006) (finding that denial of employee's request to work from home while recuperating from surgery was not adverse action under Title VII).  The Court agrees with the reasoning of these decisions and similarly concludes that the denial of an employee's request to work from home on a few occasions, without more, does not constitute an adverse employment action under Title VII, even under the seemingly broader standard applicable to retaliation claims.

However, Byrd's claim presents a slight twist on this general framework because, as a consequence of the Department's decision to deny her telework request, Byrd was charged as "AWOL" and was docked 7.75 hours of pay for her absence.  (Dkt. No. 29-3, Ex. 14).  USDA

attempts to parse these actions out, urging the Court to consider Byrd's AWOL designation and loss of pay separately from the Department's denial of her telework request. But those actions did not take place in a vacuum, and it is undisputed that Byrd's loss of 7.75 hours of pay (and her underlying AWOL designation) flowed directly from the Department's denial of her request to telework. The Court therefore considers these issues together. Nevertheless, even taking Byrd's loss of a few hours' pay into account, the Department's decision to deny Byrd's telework request does not rise to the level of an actionable adverse action for purposes of a retaliation claim. *See, e.g.*, *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (finding that being marked absent without pay for a single day was a "mere temporary inconvenience[] and [did] not rise to the level of an adverse employment action"); *Bowe-Connor v. Shinseki*, __ F. Supp. 2d __, 2013 WL 297781, at *7 (D.D.C. Jan. 25, 2013) (finding that the employer's deduction of 3.5 hours' pay was not materially adverse action for purposes of Title VII retaliation claim); *Douglas-Slade v. Lahood*, 793 F. Supp. 2d 82, 99 (D.D.C. 2011) ("[P]lacement on AWOL status for one day cannot sustain plaintiff's retaliation claim."). Because no reasonable jury could find USDA's denial of Byrd's request to telework—even considering Byrd's resultant loss of less than a full day's pay—to be so materially adverse that it would dissuade a reasonable employee from making an EEO complaint, these circumstances fail to amount to an adverse action to support her retaliation claim.

Furthermore, even assuming that the denial of Byrd's telework request could somehow serve as an underlying adverse action to support her retaliation claim, Byrd's claim fails for the additional reason that she has not established that the Department's legitimate, non-retaliatory reason for its decision is pretextual or otherwise indicative of unlawful retaliation. As the Department explains, Mr. Carlson denied Byrd's request to telework because he concluded that

her request did not satisfy either of the narrow circumstances authorized for telework under NRCS's policy.  (Joint Facts at ¶ 40).  More specifically, Byrd's request stated, in its entirety: "Due to the current work environment, I am requesting to immediately work from home." (Dkt. No. 29-3, Ex. 14).  Based on this, Mr. Carlson did not find Byrd's request to be one seeking a reasonable accommodation related to a disability, nor did he believe that her request was covered by the narrow exception for emergency situations.  (Carlson Decl. ¶ 27).  Byrd takes issue with Mr. Carlson's determination, arguing that, in light of her complaint about Mr. Lytle's behavior the day prior, her request should have been authorized as an emergency situation.   But other than her own subjective opinion that her "desire to avoid two harassers was much more of an emergency than others who were permitted to telework," (Pl.'s Opp'n at 16), Byrd fails to proffer any tangible evidence to undermine Mr. Carlson's explanation.  To be sure, it is not the Court's role to independently determine whether her request fell within the contours of NRCS's telework policy.  *See Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (explaining that the Court does not "serve as a super-personnel department that reexamines an entity's business decisions.").   Instead, the critical issue is whether Mr. Carlson "honestly and reasonably believed" that Byrd's request fell outside of the telework policy, *Brady*, 520 F.3d at 496, and Byrd simply fails to present any credible evidence to impugn Mr. Carlson's explanation in this respect, particularly given the overly vague and generalized nature of Byrd's request.[7] Accordingly, the Court grants summary judgment in USDA's favor on this claim.

---

[7]    Furthermore, the Court notes that Byrd did not submit her request until the very end of her workday on October 31st and apparently left the office without verifying whether her request had been approved or denied.  (Dkt. No. 29-3, Ex. 14).  Nevertheless, Mr. Carlson responded within two hours and directed Byrd to report to the office the following day, and Ms. Wockenfuss also sent Byrd a separate message early the next morning confirming the same. (*Id.*).  Thus, if anything, the record establishes that the Department responded to Byrd in good faith, notwithstanding the generalized, eleventh-hour nature of her request.

### 3.  Byrd's Fourteen-Day Suspension in May 2008

Byrd also contends that the Department retaliated against her in violation of Title VII when it suspended her for fourteen days in May 2008, for "Failure to Follow Instructions."[8]  For its part, the Department maintains that Byrd's suspension was based on a legitimate, non-retaliatory reason—Byrd's repeated failure to cease copying senior USDA management officials on disrespectful and insubordinate communications sent to Ms. Wockenfuss.  (Def.'s Mem. at 25-26).   Byrd seizes on this explanation and insists that it constitutes direct evidence of retaliation because, in her mind, she was disciplined "for seeking relief from her higher level supervisors" from Ms. Wockenfuss's alleged harassment.  (Pl.'s Opp'n at 8, 17-19).  But as the Department rightly points out, Byrd was not disciplined because of the <u>fact</u> that she complained, but because of the <u>manner</u> in which she (supposedly) complained.[9]  *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 399 (11th Cir. 1989) (concluding that the employer's decision was properly motivated by the "hostile and disruptive manner" in which the plaintiff complained of discrimination and "habitually bypassed the chain of command by bringing her complaints of discriminatory employment practices directly to [senior management]"); *Mason v.*

---

[8]     Although Ms. Wockenfuss initially proposed Byrd's suspension on April 28, 2008, it was not formally issued to Byrd until after it was reviewed and upheld by Mr. Oaks, then-Acting Chief Information Officer, on May 29, 2008.  (Joint Facts at ¶¶ 60, 62).  Byrd then served the suspension from June 8-22, 2008.  (*See* Compl. at ¶ 24).

[9]     In the Court's view, there is a serious question in the first place as to whether many of Byrd's messages can even be legitimately characterized as "complaints" for purposes of Title VII.   To the contrary, it appears that Byrd was simply trying to disparage and discredit Ms. Wockenfuss as a manager, and several courts have held that this kind of "antagonistic behavior toward [one's] superiors," particularly where premised on "frequent, voluminous, and sometimes specious complaints," falls outside of the protected activity covered by Title VII in the first place.  *See Robbins v. Jefferson County Sch. Dist.*, 186 F.3d 1253, 1259 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see also Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 259-60 (4th Cir. 1998) (similar).  Nevertheless, viewing the evidence in the light most favorable to Byrd, as the Court is bound to do at this stage, the Court presumes that her messages were legitimate "complaints" of discrimination and/or harassment.

*Geithner*, 811 F. Supp. 2d 128, 204-05 (D.D.C. 2011) (rejecting similar argument that these circumstances constituted direct retaliatory evidence, and explaining that there is "nothing inappropriate" about instructing an employee to "raise his concerns through the appropriate channels" and disciplining the employee for repeatedly disobeying that instruction).

Byrd does not dispute that, beginning in November 2007, she repeatedly included senior management officials in her communications with Ms. Wockenfuss.   (Joint Facts at ¶¶ 48-57, 59).   Byrd also does not dispute that she continued to do so despite repeated warnings from Ms. Gugulis and Ms. Wockenfuss to "limit future communications to [her] first-level supervisor," and that future conduct along these lines could subject her to more severe disciplinary action. (*Id.*).   Moreover, the substance of Byrd's communications amply supports the Department's characterization of her messages as insubordinate and disrespectful.   For example, in response to Ms. Wockenfuss's seemingly routine request to review Byrd's work in November 2007, Byrd copied a number of senior agency officials and accused Ms. Wockenfuss of "obvious micro-management" and "stealth psychotic tactics," and of trying to "denigrate [Byrd's] name and good service record with the agency and [to] eviscerate, demoralize, and degrade [her]." (Dkt. No. 29-3, Ex. 26).   Byrd subsequently accused Ms. Wockenfuss of "abuse of authority" and "call[ed] into question [Ms. Wockenfuss's] reliability and suitability to supervise," again copying senior management.   (Dkt. No. 29-4, Ex. 30).   Byrd later warned Ms. Wockenfuss—while again copying high-level managers—to cease her "unwarranted pattern of abusive behavior" and "to not badger [her]." (*Id.*, Ex. 34).   She also accused Ms. Wockenfuss of playing "psychological games." (*Id.*).   Given all this, the Department has plainly established that its motivation in suspending Byrd in May 2008 was based upon "the manner in which [Byrd] complained of

[alleged] discrimination, not on the fact that she complained." *Rollins*, 868 F.2d at 399; *Mason*, 811 F. Supp. 2d at 204-05.

Byrd challenges this explanation, however, and suggests that the Department "prohibit[ed] [her] from complaining about harassment by Wockenfuss to anyone other than Wockenfuss." (Pl.'s Opp'n at 17-18). This is not an accurate representation of the record. To the contrary, Ms. Gugulis instructed Byrd in November 2007 that she was to <u>either</u> "adhere to the prescribed chain of command and communicate [her] concerns to [her] first-level supervisor" <u>or</u> "follow the administrative procedures established by NRCS (e.g., EEO complaint process, administrative grievance, etc.)." (Dkt. No. 29-3, Ex. 24). Further, Ms. Wockenfuss later reiterated Byrd's ability to separately pursue EEO complaints, albeit somewhat less clearly than in Ms. Gugulis's prior response. (*Id.*, Ex. 27) (explaining that Byrd was directed "to restrict [her] communications regarding employment issues, <u>with the exception of certain entitlements (EEO, etc.)</u>, to [Ms. Wockenfuss]") (emphasis added). Thus, far from prohibiting Byrd from raising EEO-based complaints, the record establishes that the Department simply directed Byrd to route any such complaints through the appropriate channels—and not to simply carbon-copy a myriad of NRCS managers on her email responses to Ms. Wockenfuss.

In addition, Byrd challenges the Department's justification by arguing that her practice of including of senior agency officials on correspondence to Ms. Wockenfuss was not sufficiently "disruptive" to warrant the discipline imposed by the Department. (Pl.'s Opp'n at 18-19). While it is true that Byrd did not create loud disturbances throughout the office or engage in physical hysterics in front of coworkers, the record amply supports USDA's belief that Byrd's conduct was disruptive in its own way—by unnecessarily distracting senior agency officials from their responsibilities, by continuously attempting to undermine Ms. Wockenfuss's supervisory

authority, and more.  (Def.'s Reply at 17-18).  Finally, Byrd suggests that a jury could find the Department's explanation pretextual because, although Mr. Carlson reportedly also communicated with his third- and fourth-level supervisors, he was never disciplined in the same manner as Byrd.  (Pl.'s Opp'n at 19).  In so arguing, however, Byrd misunderstands the salient issue.   The Department's principal concern with Byrd's conduct was not that she was communicating with senior agency officials, but that she was doing so in a disrespectful and disruptive manner, in the face of repeated warnings to discontinue these types of communications.  (Def.'s Reply at 18).  Byrd presents no evidence to suggest that Mr. Carlson's communications raised the same types of concerns, much less that he was ever instructed to cease his communications, as Byrd was.   As a result, these allegations fail to advance her retaliation claim whatsoever.

Therefore, because no reasonable jury could conclude that the Department's decision to suspend Byrd in May 2008 was the product of unlawful retaliation, the Court will grant summary judgment in the Department's favor on this claim.

## D.  Byrd's Hostile Work Environment Claim Based on Race

Title VII prohibits an employer from creating or condoning "a hostile or abusive work environment" that "affect[s] a term, condition, or privilege of employment."  *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)).  To prevail on a hostile work environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999).   Importantly, the plaintiff must

establish that the allegedly harassing conduct complained of was based on a protected characteristic, *Davis*, 275 F.3d at 1123, which means that "hostile behavior . . . cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class," *Motley-Ivey v. District of Columbia*, __ F. Supp. 2d __, 2013 WL 543877, at *6 (D.D.C. Feb. 14, 2013) (quoting *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)).  This is significant because:

> Everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeal.

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

Furthermore, "[n]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (internal quotations omitted).  "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). By contrast, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 21); *Stewart*, 275 F. 3d at 1134 ("[A] few isolated incidents of offensive conduct do not amount to actionable harassment."). These "demanding" standards are designed "to ensure that Title VII does not become a general civility code" that would require courts to police "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (internal quotations omitted).  In determining whether a work environment is

impermissibly "hostile," the Court must look to the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

With these standards in mind, the Court turns to the merits of Byrd's hostile work environment allegations. She relies on two incidents to support her claim: (1) Ms. Pigg's alleged use of the term "HNIC" during a staff meeting in September 2007, and (2) Ms. Pigg's purported "assault" of Byrd more than seven months later, in April 2008. (Pl.'s Opp'n at 14-16).[10] In seeking summary judgment, the Department argues that, even crediting Byrd's version of events as true, neither of the isolated and attenuated incidents she identifies—whether considered on their own or taken together—gives rise to an actionable claim for hostile work environment based on Byrd's race. The Court agrees.

First, it is well settled that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (alteration in original) (internal citation and quotation omitted); *Meritor Sav. Bank*, 477 U.S. at 67 (same); *Freedman v. MCI Telecommc'ns Corp.*, 255 F.3d 840, 848-49 (D.C. Cir. 2001) (finding no hostile environment based on single statement of "religious slander"). As a result, even assuming that Ms. Pigg did use the term

---

[10] As touched on earlier, Byrd originally appeared to rely on allegations surrounding Mr. Lytle's purported conduct to support her hostile work environment claim. However, Byrd wholly fails to address those allegations in her opposition brief, despite the fact that the Department specifically argues that Byrd's alleged interaction with Mr. Lytle cannot support a hostile work environment claim. The Court therefore treats that argument (and any underlying claim Byrd may have been advancing in this regard) as conceded. *Hopkins*, 284 F. Supp. 2d at 25 (citing *FDIC*, 127 F.3d at 67-68).

"HNIC" in Byrd's presence, this single statement—while unquestionably despicable and offensive—does not surpass the severity or pervasiveness threshold necessary to sustain a hostile work environment claim. *See Harris v. Wackenhut Servs.*, 419 F. App'x 1 (D.C. Cir. 2011) (affirming summary judgment and explaining that "three racially motivated comments directed at [plaintiff] during a one-year period" did not "amount to actionable harassment"); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 518 (6th Cir. 2009) (affirming summary judgment on hostile work environment claim in favor of employer although the plaintiff "often overheard several employees use the word 'nigger' at work"); *Placide Ayissi Etoh v. Mae*, 883 F. Supp. 2d 17, 52-53 (D.D.C. 2011) (holding that plaintiff's contention that supervisor used the term "nigger" directly was not enough to support hostile work environment claim); *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 62-63 (D.D.C. 2011) (finding plaintiff's allegations that "his manager referred to him as a 'nigger' in one instance and that he overhead another manager call his co-worker the same racial epithet on another occasion" insufficient to sustain claim of racial hostile work environment); *Bryant*, 265 F. Supp. 2d at 64 (concluding that no hostile work environment was created even though a coworker referred to the plaintiff as "nigger").   Of course, the Department disputes that Ms. Pigg actually used the term "HNIC," and the ensuing investigation into the incident lends considerable support to this position, given that none of the other employees who overheard the exchange—including other African-American employees—recounted that Ms. Pigg used the term "HNIC."   Nevertheless, even when viewing the facts in the light most favorable to Byrd, a coworker's single outburst of the term "HNIC" simply provides an inadequate foundation for a viable hostile work environment claim.[11]

---

[11]    Further, as the Department points out, it is uncontroverted that Ms. Pigg did not know that Byrd was on the line when she made this alleged comment, which means that Ms. Pigg was not directing this comment at Byrd.   While not dispositive, this fact also undercuts Byrd's

Moreover, the Department can only be held liable for Ms. Pigg's claimed epithet if it "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). Byrd presented no evidence to suggest that this was the case, and in fact, the undisputed facts in the record establish just the opposite. Upon learning of Byrd's allegations, Mr. Carlson promptly began investigating the incident and quickly passed off the investigation to an EEO Specialist within the agency, Mr. Page. (Joint Facts at ¶¶ 24-26). Mr. Page then interviewed the participants in the meeting and prepared a written report surrounding the incident. (*Id.* ¶ 26; Dkt. No. 29-2, Def.'s Ex. 8). Ultimately, while none of the other participants corroborated Byrd's claim that Ms. Pigg used the term "HNIC," several employees confirmed that Mr. Pigg did say "HMFIC," and, as a result, Mr. Carlson issued Ms. Pigg a written reprimand for using vulgar language in the workplace. (Joint Facts at ¶¶ 27, 29). Given all this, no reasonable jury could conclude that the Department "failed to implement prompt and appropriate corrective" action in response to Ms. Pigg's alleged remarks, which means there is no basis to hold USDA liable under Title VII. *Curry*, 195 F.3d at 660; *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 162-63 (D.D.C. 2012) (dismissing racial harassment claim where employer "responded promptly and appropriately to the one instance of alleged harassment").

Nor does Byrd's claim that she was subsequently "assaulted" by Ms. Pigg in April 2008 give rise to an actionable hostile work environment claim. For one, Byrd does not adduce any evidence to suggest that Ms. Pigg's alleged conduct was motivated by Byrd's race, as she must.

---

reliance on this incident to establish a hostile work environment, given that "[c]onduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment." *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) (citing *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)); *see also Sewell v. Chao*, 532 F. Supp. 2d 126, 141 n.12 (D.D.C. 2008).

*Davis*, 275 F.3d at 1123; *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 163 (D.D.C. 2007).  At most, the record establishes that this altercation was the result of "a clash of personalities" or some general animosity between Byrd and Ms. Pigg, "rather than discriminatory animus." *Bryant*, 265 F. Supp. 2d at 64 (quoting *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 315 (S.D.N.Y. 2000)); *see also Morris v. Odham Cty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus.").  Nonetheless, even if Byrd could tie some degree of racial impetus to her scuffle with Ms. Pigg, this single, disparate occurrence is not sufficiently severe or pervasive to sustain her racial harassment claim, whether viewed in conjunction with Ms. Pigg's alleged epithet (made more than seven months prior) or not.  Instead, these are "the sort of 'isolated incidents' that the Supreme Court has held cannot form the basis for a Title VII violation."  *George*, 407 F.3d at 416-17 (quoting *Faragher*, 524 U.S. at 788); *Stewart*, 275 F.3d at 1134.  Finally, as before, Byrd's reliance on this incident is weakened by the fact that, upon learning of the altercation, Ms. Wockenfuss and Mr. Carlson promptly and appropriately responded by temporarily suspending both Byrd and Ms. Pigg while the incident was reviewed and investigated.  (Joint Facts at ¶¶ 66-70).  Although neither version of events was ultimately corroborated with independent evidence, it is undisputed that Ms. Pigg resigned following this incident and therefore no longer interacted with Byrd in the workplace. (*Id.*).  Therefore, considering the totality of the circumstances, the Court concludes no reasonable jury could find Byrd's allegations support an actionable hostile work environment claim based on her race.  The Department is thus entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Department of Agriculture's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.   An appropriate Order accompanies this Memorandum Opinion.

Date:  March 18, 2013

_____
ROBERT L. WILKINS
United States District Judge